I represent the defendant appellant in this case, Antonio Rodriguez-Preciado. He went to trial on a drug charge and lost. He was sentenced to 235 months in prison. The brief raises six issues and four of those have to do with searches and statements and addressing those in the sequential order in which they occurred. The first question is whether or not there was any consent, any valid consent, for police officers Haskell and Lilley and another I believe, to enter into a room rented at the Satellite Motel, room 206. At the time the police approached the motel, they'd been told by Robert Glenn, the person who'd been under investigation, that Mr. Rodriguez-Preciado had been supplying some methamphetamine and other drugs to him and that he was at the motel in room 206. They went there and the door was answered by a gentleman, Mr. De Silva, who spoke only Spanish and none of the officers spoke any Spanish at all. Officer Haskell, none of the officers spoke Spanish fluently. And none spoke any Spanish at all? Is that what the record says? He says that he, I think I have to say that what he says is that he didn't speak Spanish fluently. But that's different from saying none of the officers spoke Spanish. It is, Your Honor, and that's why I corrected myself when I said didn't speak Spanish at all. But at the suppression hearing, Officer Haskell was quite clear that his Spanish was very weak. But he claims to have gotten consent from Mr. De Silva to enter into the motel room. And our position is that it wasn't unequivocal and specific, knowing and voluntary consent. But the judge found otherwise. The judge did find otherwise. So we have to find clear error. Was there clear error? I asked the court to apply the de novo standard of review because you have to infer consent from the circumstances. And there are cases in this circuit that will apply the de novo standard of review in those circumstances. And those are raised in my reply brief. And why do you have to infer consent from the circumstances? And the testimony was that, you know, if you believe it, that he said, the officer said, can we come in? And Mr. De Silva came in and motioned him in. So what's circumstantial about that? You cannot believe it, but if you believe it, what's circumstantial about it? The circumstantial nature of it is in the translation, in that Officer Haskell doesn't speak Spanish. But he said he asked him in Spanish. Now, you cannot believe him, but he said he asked him in Spanish. Right. And yet it's the government's burden to prove that the consent was unequivocal. And without... Well, the witness says, I asked if we could come in and he said yes. So what's equivocal about that? What's equivocal about that? There may be questions of how well the officer spoke Spanish or whether the witness could speak English. But once the officer gives that testimony, it seems unequivocal. But there is the spot where the process fails to inquire into what really went on. The government has the burden of proving whether or not there was consent. The government produces an officer who admits he doesn't speak Spanish well. The only communication between the consenting party and the officer is in Spanish. The government has the burden of proving how well the officer can actually ask the question, may I come in? The government didn't do so. It's become a simple question now. Very simple question. And for that reason, it would be very simple for the government to carry its burden. By asking Officer Haskell on the stand... It would have been very simple also for the defense counsel to have said, okay, exactly what did you say? In Spanish. Pardon me. Go ahead. That would also very simply reverse the burden of proof. It's the government's burden of proof of establishing... The government's got to prima facie case. The government says, in Spanish, I ask him in Spanish, he responds. That's a fact. You can cross-examine him, but it's met the burden. I don't see how you have a problem with that. I suggest to you, this isn't your strongest issue. Well... We have 20 minutes. Let me turn to the next issue, which touches on SIBA. The next issue has to do with whether or not Mr. Rodriguez-Preciado was adequately advised of his rights under Miranda. He's Mirandized when he comes back to this room, right? What happens is... He's Mirandized on the 26th. That's true, Your Honor. On the next morning, he's questioned again, and he's not re-Miranda. Exactly. So why is that a problem? It's only, it's within one day. Do you have any precedent that would indicate that when there's like, you know, I don't know if it was 15 or 16 hours from when he got his Miranda warnings on the 26th, and then from when he starts getting questioned again on the 27th, is there any case that says that that minor length of time makes the warning stale? I can't give you a specific case that makes... What's your best case? Because that, I'm just trying to get you right to what's bothering me. I want to give you a chance to change my mind. It seems to me that he gets Miranda warnings. Sure, if they, you know, kept him for three months or maybe even three days, maybe under some circumstances, they'd have to re-Mirandaize him. But I'm not getting why in the circumstances of this case, he's got to get Miranda warnings again the next morning. I think Siebert is my best case. And let me jump back to the 26th first, because the same process occurs but in abbreviated form on the 26th that occurs on the 27th. On the 26th, Mr. Rodriguez-Preciado comes into the motel room, the police officers are already there, allegedly from Mr. De Silva's consent, and they explain that they searched the room, and then they, then Officer Haskell asks... Has found nothing. Found no drugs or... Found no drugs. Drugs or guns. They found some stuff that would allegedly connect Mr. Rodriguez-Preciado to Mr. Glenn and his business, Castle Lane. But the next question is clearly a question designed to eliminate an incriminating response, that is, do you have any drugs? And Mr. Rodriguez-Preciado says yes, and he produces some cocaine. But you're now also not in your strongest argument because he wasn't in custody at that point. I would argue that he is. He's in his own motel room, and three officers are there to greet him, and he has nowhere else to go. Where is he supposed to go? But let's turn to the 27th and the question of whether or not the warning that was given on the 26th ought to be effective. The cases that hold that a warning will carry over and remain effective are based on very different facts. Della Pena is the first. That's a case in which 15 hours elapsed between the first warning and the second interrogation. And in that case, the defendant was reminded of the earlier warning. He claimed that there was no defect in the earlier warning, and we do claim here that there is a defect. What was involved here? Was it 16 hours? Isn't that pretty close on the facts to that case you just mentioned? I cannot give you the exact timing. It's an evening visit to the motel room, and it's a midday visit to the jail. So I would say that it is probably in that ballpark. It's about six o'clock at the motel, I believe, subject to correction. And then it's due to about 2.40 at the motel room. Does it matter from when the warnings are given or from when the prior interrogation ended in terms of whether there was continuity in interrogation or not? And then when you're done with all that, I'd like to know why this isn't all harmless error in terms of what the sentence would have been if everything that Mr. Rodriguez-Preciado referred to during all of his interviews were just taken out. Would he not have the same sentence? First, as to the issue of where do you mark the time, I urge the court to find that you ought to mark the time from the end of the interrogation, not from the time of the warning, because the person during the interrogation is still involved in the same process. Their mind is focused on what is going on. And that is the case, I think, in Delapena, where the interrogation goes on for a while. There's a gap of 15 hours between the warning and then the second interrogation. But the first interrogation goes on through the evening. And the other question as to whether or not this is harmless error, it clearly isn't harmless error, in that the trial was based on a great number of records that were seized from Mr. Glenn and the testimony of a number of people who were involved with Mr. Glenn in the transportation and selling of illegal substances and full substances. And they all testified against Mr. Rodriguez-Preciado. And didn't they know about them all before? Didn't the government know about them all before? The government did, but the jury didn't. The jury, if it's harmless error, the question is, didn't the government know about those people before? Yes. But the question is whether or not the statement that Mr. Rodriguez-Preciado gave, and that is offered against him at trial, influenced the jury in convicting him. That's where the question lies. And if this were a trial simply where the government produced a parade of informants and there was no statement offered by a police officer, allegedly from Mr. Rodriguez-Preciado, the case would be on a much different footing than it is where the statement is offered. And for that reason, you can't view the statement to be harmless error. So you're not relying on it for purposes of sentencing. You're relying on it for purposes of the conviction. For the conviction. For the conviction. And going back to the distinction between the cases which allow this lengthy hiatus between warning and second interrogation, Nordling is another case, and it involves absolutely no appreciable time. That's a case involving a fellow who's apprehended at the airport. One set of agents questioned him for a short period of time, and then they turned him over to DDA agents at the airport. But there's just no break in time whatsoever. And Andoverde is the third case. Andoverde involves allegedly, or apparently, a day between the warning and the second interrogation. But in Andoverde, significantly, there is no challenge to the adequacy of the warnings in the first place. And the defendant acknowledged that he had the right to silence him. I guess I'm still waiting to hear a case that holds that warnings once given have become stale in circumstances close to the circumstances here. I can't give you a trial. Because Siebert, I don't think, addresses that issue, does it? I know that under Siebert, if they got something incriminating before they give him, when he's in custody, and they get something that's wrong, and then they later mirandize him, and they get something, they get it repeated, that's a Siebert. Siebert says they can't do that. But here, we're not dealing with that, really. We're dealing with something very similar to that, in that there was the incriminating request, do you have any drugs, at the motel. But OK, but then your premise is that he was in custody right then. When he came into the motel, Officer Hanson testified that he thought he had probable cause. And I don't quite understand your Siebert analysis. I assume you're relying on the plurality opinion. But that's not the holding of the court. There's only, there's not five votes for that. There's, you have to have Justice Kennedy's vote. So the only holding with five is the Justice Kennedy's separate concurrence, where he said that the Siebert analysis of the plurality will apply only when the police have deliberately employed the question first tactic. Now, that's Siebert, and we can't go any further than that for a holding in Siebert. We can rely on the plurality at our own volition, but as far as a holding, it's only when the police deliberately use this tactic. I didn't find anything in the record of a factual find the police had deliberately employed the question first tactic. Is there any? There's no statement that the officer made on the stand that this was a strategy for attack. And turning to the interrogation on the 27th, which is the more elaborate interrogation at the jail. So Siebert really, the holding of Siebert doesn't help you much. Yet all. Holding. The holding is problematic for me. Well, what is the holding? I would agree with Justice Wallace that the holding is that you apply Elstead unless there's a deliberate failure to walk. When there were seven votes against that position, squarely against that position. The better approach is the approach authored by, I believe it's Souter, who says that you have to apply a reasonable test whether or not the delayed warning could be effective. If you get into the mind of the questioning officer, you're in a quagmire and you're never going to get anywhere. No, but if Judge Wallace is right and that's the holding, that's the holding. But is it the holding? I ask you to apply the test of the plurality. Why? The question, Judge Baristas, is holding. You're asking us to apply the test of the plurality. She's asking you, what is the holding? And you've already conceded that it has to be Justice Kennedy's concurrence because that's the only place you have five votes. It's the only place you have five votes in that case. Excuse me. Do you have five votes? Where's the five votes? You have the plurality except for Breyer saying, absolutely not. We're not going to look at anything subjective. You have the dissent saying, absolutely not. We're not going to look at anything subjective. So how can that be the holding? But I may have them all. The plurality is offered by Souter with Stevens, Ginsburg, and Breyer. And It's very complicated and crazy in my view. May I suggest the way that I would solve this? The holding in Seaver is that in that case, the warnings weren't effective. And how this Court gets at that, the best way to approach it is to determine whether or not the warnings were reasonably effective to advise the defending that he had a right to stop talking. And is it suggestive, although Seavert was, if one accepted that, although Seavert was not addressing the question of the time and place and custody differences as to when a Miranda warning hold becomes stale. It was essentially stating a standard that would govern that question, wasn't it? I.e., whether the Miranda warnings would still be effective in the change circumstance. Yes. So it's informative if we think that's a useful standard, not only for the direct circumstances. I'm afraid I've lost the thread. Can you restate the question? Yes. Seavert was not directly addressing the issue we were discussing before. That is, if you give somebody Miranda warnings at a certain time and place by a certain individual and then interrogate them sometime later or in a different place by a different person under different circumstances, when do the Miranda warnings essentially elapse? That wasn't the issue in Seavert, right? No. But it's informative on that question nonetheless. Yes. Yes, it is. Why? Well, because the underpinning of Seavert is the directive in Miranda that the warnings have to be effective. And in Seavert, the court found that they weren't effective because of the persuasive nature of this two-part interrogation. It's a strategy. But why would warnings given on the 26th in the evening or late in the day not be effective to put someone on notice of their rights the following morning? In this case, because there's a separation in language between Mr. Rodriguez-Preciado and Mr. Haslam. Why does that mean that the person wouldn't understand the warnings? In this case, it means that my client didn't understand the warnings. It's a question that's based on the facts. If you look at the cases that allow elapse of time, those are cases in which there's no dispute about whether or not the warnings got across in the first place. And in this case, there is a dispute about whether the warnings got across in the first place. And if the court's going to remain true to Miranda's directive that the warnings have to be effective, it can't allow questionable warnings on the 26th to carry over into this more elaborate interrogation on the 27th. So if you made a statement on the 26th, you'd claim it should have been excluded? And I do, Your Honor. I do. Not just on the 27th, but on the 26th. Yes, and I do. That is raised in the briefs. I do challenge both statements. That, I think, is assignment of error number two. The district court should have suppressed statements taken from Rodriguez-Preciado on June 26th and 27th due to compounding Fourth Amendment and Miranda violations. So I certainly do urge the court to suppress the statements that he gave on the 26th. And one more point. To the extent that the court's trying to decipher the intent of the Supreme Court in Seabrook, it's worth noting that I think it is Justice O'Connor who criticizes the effort to subjectively explore the intent of the officer. Because few officers would be as candid as the officer was in Seabrook coming right out and saying, this was my practice. This was my intent. And if this court is going to employ the safeguard of Miranda effectively, it can't rely on something as tenuous and nebulous as the subjective intent of the examining officer. OK. Well, your time has gone past your time. Let's see if anyone has a question. If not, we thank you for your argument. Thank you. We will now hear from Mr. Ratto. I'm pronouncing that correctly. Grant advice, its understanding and waiver must proceed custodial interrogation in order to obtain a voluntary statement. It would be admissible in evidence. The defendant, in this case, was neither in custody or under interrogation when Officer Haskell asked the question, do you have any drugs in the person? This seems to be the critical issue that the court is focused on with counsel. But I believe that there is reason to pursue the issue of consent, given the record that's established in the case and the arguments presented by the government in its brief. The court asked for a discussion of the Seabrook case. Miranda isn't at play with the Seabrook implication because the defendant was not in custody when Haskell asked that question. And it was not a question that was in the nature of interrogation. Well, it wasn't a nature of interrogation, but it wasn't. He probably wasn't in custody. Why wasn't it in the nature of interrogation? Do you have drugs? It's not interrogation. Under the public safety exception, Miranda, if this court was to found. What's the public safety? I do think that you have lots of good arguments, but that was a bad one. What's public safety about whether you have drugs in your pocket? This officer, and I would argue officers placed in today's marketplace of arresting individuals have health concerns and they have, as he articulated and as the case is cited, suggest concerns about exposure to toxic substances. That's what the officer. So every time somebody wants to know if somebody has drugs, they can go up and ask whether they have drugs because that's a safety concern. Yes. Anywhere, any place, just come up and say to somebody, do you have some drugs? Because there's a safety concern. I think there's two issues. Including that they're in custody. Near contact and then there's the custodial contact. But if they're in custody, then, I mean, this only matters if he's in custody. So you have to be saying that even if he's in custody,  And they have to answer the question. Without Miranda. They don't have to answer the question, but the officer with the right foundation for why he is concerned for his personal safety under the case law can ask that question. And the answer. I suggest you talk to another Miranda. Yeah, let's move on. That argument is a pretty tough one for the government. Miranda, when that decision was presented, made a distinction between custodial interrogation and on-field questioning. And that is what we have here. We have an officer and several others who are present in the motel room. They've been admitted into the motel room by consent. And they go through a series of questions. And in their contact with the defendant, they point out who they are, what they're there for. And that they haven't found any drugs or weapons. And then they ask that question, do you have any drugs on your person? His response is a volunteered response. He does. And immediately thereafter, there's an advice that Miranda writes. This is a scenario in which. Miranda doesn't apply up until that answer. And Siebert is a very different circumstance where the court is looking at this deliberate. All right. So what about after that? Let's assume you're right. And then so he was told in his hotel room. Let's assume you have somebody who really doesn't know anything about his rights. And that these Miranda Williams are actually doing what they're supposed to do. And he is in his hotel room. He's just been told he's under arrest. And they say, you don't have to answer questions. You can have a lawyer and so on. Right. After that, they take him in a car and they take him to the police office, I guess. The Washington County Sheriff's Office. Sheriff's Office. They interrogate him there for a little while. Then they take him. But to this point, he hasn't been incarcerated. Right. Then they take him. They take him someplace else. They now incarcerate him. Right. He's in prison. He's 16 or so hours after the first warning. And we're not sure. Maybe we can eliminate how long after the first interview ended. Some different person comes, takes him out of his jail cell where he wasn't before, to a different place and starts talking to him. So the question is, how do we decide? What factors do we look at to decide? Do we just look at time? Or what do we look at to decide whether that warning given in a very different place, circumstance, people, et cetera, still carries on? Time-wise, the officers went to the motel at around 9 o'clock in the evening. I don't have a time for when they began their contact with the defendant, asked the questions, or when they got him back to the Washington County Sheriff's Office and went through the thorough review of the facts and obtained this detailed confession about the conspiracy of the contact. We don't know when that ended. We don't know when that ended. And I cannot pull up the time for you on the next day. I heard the next day was about 1-1-30 in the afternoon. That's my recollection. And the cases that I, that counsel discussed with you are around 15 hours, with Miranda rights being effective through that time period. And what I'm asking you, is that the only question? Is time everything? Well, no. I think with Miranda, time is maybe the least significant factors. The question is, does the person understand their rights? And it's during that next day contact, midstream, when the officer brings out the Miranda card. Well, why'd he do it then if he didn't think it was a problem? Why'd the officer even do that? I don't know, but I'm glad he did because he said, do you remember these rights that were given to you by Haskell yesterday? Yes. Did you understand them? Yes. That's the nature of that. I don't think that's what he said, frankly. I thought he said something like, I think I do, or something rather vague. Again, my recollection was, and... Is there a record of exactly what people say was said at that time? Yes, it's Officer Romanaggi. I asked him if he remembered receiving his Miranda rights when he was interviewed the night before by Officer Haskell, I believe. He stated he thought he had. That's on page 77. So, if he's asked, did he remember his Miranda rights, and he says, I think I do, how would that show up? Why would we think that's stale then? Well, my point is that he has been advised previously an effective Miranda waiver, comprehension of rights on the preceding evening, and here the next day he's remembering those rights. The only evidence before the trial court, before you, is this testimony. The trial court made its finding. Do we know when he came back to the hotel room, what time that was? Did he say it was 9 o'clock at night? The officers came at 9 o'clock to the motel room when they had contact with Silva. So he came after 9 o'clock? Yes. But do we know how, and we know that after they started talking to him, they questioned him for some time on that evening, right? Yes, they did. But, so do we know for how long they questioned him? No, you have the substance of the interview with him there at the motel room, in which they go over whether or not there are weapons or drugs in the vehicle. They obtain consent to search the vehicle. They ask if he has any other drugs on his person. They obtain consent to search his person. They search his wallet. They search the vehicle. They find a cell phone. They actually have the phone ring while they're present. Brett Geiger calls, speaks with the defendant. The officer recognizes Brett Geiger from an earlier investigation. Has Brett Geiger come to the motel room? They talk to Geiger about that cell phone and ultimately give him the cell phone. And it's then at that point that they decide to pursue the moored boat. If we assume all these things that we don't have the timelines on happen pretty fast, they're still probably questioning him, you know, up until at least 10 or 11 o'clock at night if they didn't ever get there until 9, I suppose. Yes. And then when do they start with him the next day? I believe that, again, from what we've been talking about, Judge Verzon's recollection was around 1 o'clock in the afternoon. I don't have that time for you right now. Are you guessing or do you have something to base the 1 o'clock? I don't have a citation to the time here before me. I would like to get to that. Let me ask you a question. Judge Verzon asked you, I think, an important question. That is, how do we test this and whether it's stale? And let me suggest to you a test that this is a factual determination of the status of the mind of the defendant, whether A, initially understood, and B, still understood at the time that he was questioned the next day. And that factual determination would be determined by the totality of the circumstances, our usual determination. And, in fact, the judge made such a claim. So isn't that what we're looking at is a factual finding based upon the totality of the circumstances, which the appellant will demonstrate if he can, but is clearly erroneous? That's right. That's about where we are? Yes. But that's essentially a subjective standard, right? Something like a voluntariness standard. Yes. So then aren't we back to Siebert in this very intriguing, peculiar question about whether there is a binding ruling in Siebert? Because although Siebert wasn't directly addressing this problem, it was addressing an awfully related one, which is when are Miranda warnings effective? Which is really what we're asking. And the plurality seem to say that this is an objective standard as to which you look at certain factors. And Justice Kennedy seemed to say that you look at a good faith issue. And the dissent seemed to say something like what Judge Wallace was saying, which is you look at something like a voluntariness standard. And we don't have five votes for anything, do we? It's a hard case to read. Justice Kennedy's decision talks about the applying a narrower test, which is what he would do, applicable only in the infrequent case such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine Miranda. So he would look at the police officer's purpose, the subjective intent of the officer. Right. But although under Marx, you usually look at the narrower test here, that test was decisively rejected by seven votes, wasn't it? How can we look at and use that one? I'm just trying to, you'd ask at one point, what was the test set for by Justice Kennedy? No, I'm asking what the test is that we're supposed to get out of this overall opinion. I don't think it applies to this case. I think that you're at best at Elstad and maybe something less than Elstad. Because in Elstad, they went in with a warrant. They went into the person's room. They said, come out to the living room and get dressed. In this context, the officers were lawfully present. They had mere conversation with the defendant as he came in. As he came in and as they talked with him. And he understood his Miranda rights. English as a language was not an issue in this case. Under the record, the pre-trial hearing had Haskell saying he had no difficulty talking in English on page 29 of transport 6, the motion hearing. The trial testimony was even more demonstrative. Haskell again repeated the same in reportage transport 7, page 53. Romanacci spoke in English the whole time, page 68. Robert Glenn testified he only spoke with the defendant in English. And Glenn didn't speak Spanish. And that's transcript 8, page 56 in Glenn's testimony. Rascio, the woman's co-conspirator, said she spoke English with Mr. Rodriquez-Preciado. I didn't speak Spanish. And that's, again, the same trial transcript, page 88. From the district court's determinations, not that I need to oversimplify this, it seems to me the district court thought he understood the warnings on the 26th in English, that he understood them. And that the questioning on the following day was close in time to the giving of the warnings the first day. Yes. Right? So we just stopped with that. He understood the warnings on the 26th. And the questioning on the 27th was close in time, which is a phrase in the district judge's ruling. You know, why doesn't, why don't we stop there? I'm prepared to. And I mean, can we stop there given seizures? Yes. Because it seems to me that even if the standard that Judge Berzon mentioned earlier in the argument were applied, that we, you know, we look, Siebert's about something else. It's not dealing with staleness. So we looked at his general guidance. But the question is whether the warnings are effective. I don't know why we would think they're not effective when he understands them on the 26th, which is a factual determination. Probably not purely erroneous. And when the questioning comes so close the next day. So I guess I would like you to address the same question I asked your colleague, except from the other side. What's the best case that you would urge that says that this length of time does not make the warning stale? I think those cases are cited in the government's brief. And the two cases in which the 15-hour interval without re-advice is sufficient, I believe, are Atterberry. So I understand we've got these cases in your brief. Now, your colleague argues on the other side that those cases are different because there was no question about whether the warnings the first day were adequate. But is there a question on that? Or is there not? If the judge has said he understood it? Well, I don't think there's a question where the factual record is the officer provided complete Miranda rights. The defendant indicated he understood. I'm looking at something. It's got a base stamp 00025. It's a ruling of the district judge, I guess, or a transcript of it. And it's page 99 of some other transcript. And the judge says, I find that Mr. Rodriguez understood those rights as given to him in English. So he's made a fit. Isn't that a factual finding? Okay. He also made a finding that it was close in time and not necessary to give them again. Are those factual findings? Yes. Well, you're over time, but we'll give you a minute, but not more than one minute to reply. And I'll be mean and cut you off after. You better be mindful of that minute. The location where the timing for the end of the second day interrogation, the timing for the second interrogation entirely appears at page 80 of transcript number six. And it is from 1 o'clock to 2.40. An important factual distinction between this case and Andoverde and other cases allowing this lapse in time is that here, the officer only testified that Mr. Rodriguez-Preciado thought he had been warned, not that he had actually been warned and acknowledged that he had the right. What do you do with the district judge's finding that Judge Wallace mentioned from that page I was mentioning? He says, I find he understood his rights on the 26th and this next interrogation was close in time. And at 10 seconds. First, those are mixed questions of law and fact. Close in time. Certainly, it's close in time, but is it close enough? Close enough is a legal determination. Isn't the legal question whether close in time is enough or whether we had to consider other factors they didn't consider? Yes. Yes. I do urge the court to consider other factors. Well, not whether we should consider other factors, but whether the district court should have considered other factors. Or this court. It should be considered to determine whether the warnings are effective. And here they weren't. And this case is much different from Delapana and Verde and the others. Thank you very much. We appreciate the excellent argument on both sides. Thank you. Now, we have left. We've got two cases that are each 20 minutes each side. Do you want to take a break now or do you want to go one more case? Take a break now. Okay. We will take a break and we'll be back. Before long, they have some more great arguments. Unfortunately, it takes me a little while to maneuver out of here. Yeah, I really feel bad here. Try it a different way. Can you scoot back? I'll back out. Pull it back. Court stays in recess for 10 minutes.
judges: Wallace, Gould, Berzon